Mr. Slack, whenever you're ready to go, we're glad to hear from you. Thank you, Your Honor. May it please the Court. Ben Winograd, representing the petitioner. The primary issue in this case— My mistake. Sorry, Mr. Winograd. The primary issue in this case is whether non-citizens whose grants of asylum have been status under 8 U.S.C. 1159B. We ask this Court to join the Fifth Circuit in holding, under the first step of Chevron, that such former asylees remain eligible to adjust under that provision. But even if the Court finds the intent of Congress unclear, we ask it to not defer to the Board's decision in this case under Chevron or Skidmore. And if the Court does rule in our favor, we ask it to order the government to facilitate my client's return to the United States for the continuation of his removal proceedings. Now, at the outset, if the Court has any questions about the government's mootness argument, I would be happy to answer them. Otherwise, I will turn to the merits. The underlying premise of the Board's decision was that the phrase, the status of any alien-granted asylum, refers only to current asylees. And if that phrase existed in a vacuum, there might be some force to that argument. But that phrase does not exist in a vacuum. And language in three surrounding provisions strongly suggests that Congress did not intend that phrase to mean what the Board said it means. The first is 1159A, which is the provision that allows refugees to adjust to LPR status. Congress listed three requirements for refugees to adjust status, the very first of which is that their admission, quote, has not been terminated. Because Congress expressly prohibited former refugees from adjusting status, but did not expressly prohibit former asylees from adjusting status, there is a strong negative implication that Congress did not intend to prevent former asylees from adjusting status. So what's your best guess as to why Congress would have done that, treated the refugees different from, well, people who once had refugee status different from people who once had asylum status? Sure. There is no legislative history on that point. But I would note that the grounds for termination of asylum status are much broader than the grounds of termination of refugee status. The only way refugee status can be terminated is if the non-citizen was not a refugee at the time of admission. In other words, they were admitted based on fraud. So in that scenario, perhaps clearly should not be allowed to adjust based on their refugee status. Am I reading, I don't have any experience with 1159A, but am I reading it right? It sounds like for refugees, unless your status has been terminated, if you are admissible, like, that's it, they're going to adjust your status, that it's not a discretionary determination, or is it still discretionary? I am not certain about that myself, Your Honor. Typically with adjustment of status, there is a discretionary component. But although this particular statute does not say may, so I am not certain about that. Counsel, can I ask a question? And this is, I think, in response to what you said in your introduction, that even if we consider the statute ambiguous, you ask us not to defer under either Chevron or Skidmore. And I'm trying to make sure I understand what your, if we do find it's ambiguous, how should we go about interpreting the ambiguity? What's your position on that? Sure. Well, our position is that if the reasonable for Chevron purposes, because the scheme that it creates is arbitrary and capricious. So as a result of this decision, whether a non-citizen can apply for adjustment depends not on whether his grant of asylum is actually amenable to termination, but simply on when an IJ happens to decide the government's request to terminate asylum. So in some cases, such as this in other, and thereby preventing the non-citizen from adjusting status. In other cases, the IJ will simply defer the request, thereby allowing the non-citizen to apply for adjustment of status. So under this approach, if we've concluded that the statute is ambiguous and we're not according any deference to the agency, how are we to resolve the case? Sure. I think there are two possible ways. One is that the court could simply interpret the statute based on what it thinks is the best interpretation. But acknowledging that under Brand X, the board might be free to reach a different conclusion if it takes into account any reasons this court declined to afford Chevron deference. Alternatively, the court could simply remand for further consideration by the agency itself. So I think it would depend on the reason the court declined to defer under Chevron. Can I ask you a question about your Chevron Step 2 argument? So if you're right, and just assuming, I guess, hypothetically that, oh, that would be sort of an arbitrary result, why isn't that something we can look at under Chevron Step 1? Like, we normally, in construing a statute, try to avoid random and arbitrary results. Why is that a Step 2 issue but not a Step 1 issue? Well, we frame it as a Step 2 issue because under the assumption that the intent of Congress was not clear. But under Step 1, it seems like the Supreme Court more and more is telling us, like, bring out the whole toolbox on Step 1 before you call something ambiguous. Like, you should try everything to figure out what the best meaning is or what the proper meaning is. And I don't see why, as part of that toolbox, sort of avoidance of arbitrary results wouldn't count. I understand your argument at Step 2. It seems to me that some of what this case is about is how much we're supposed to do with Step 1 these days. So I guess maybe instead of just, why don't you tell me what you think we can do under Step 1 before we get into this whole Step 2 issue? Well, yes. I think certainly the Court could try to avoid an arbitrary result under Step 1 because presumably Congress does not like to reach arbitrary results. But I think under Step 1, the Court would need to look at not simply the language of the Prefatory Clause of 1159B, as the Board did, but the surrounding provisions. So I already spoke about 1159A1. Another provision the Court could look at is the note to Section 1159 that Congress enacted as part of the Immigration Act of 1990. That provision applied to non-citizens who had been granted asylum but who no longer qualified as refugees because of changed circumstances in their native country. And parenthetical, Congress confirmed that such non-citizens could adjust status under 1159B regardless of whether or not their asylum has been terminated. So by specifically authorizing former asylees whose grants of asylum had been terminated to adjust status, Congress necessarily believed that they qualified as aliens granted asylum. Now the Board did not discuss this in the statute, but 1159B2 uses language I think you already talked about that would seem to argue the other way. That's a statute, not a note. Yeah, well, we rely on Section 1159B2 because 1159B2 uses the phrase granted asylum in a way that the parties agree refers to a historical event. It says, to qualify for adjustment, a non-citizen must, quote, be physically present in the United States for at least one year after being granted asylum. So the parties agree that that refers to a historical event, and we think it would have been odd for Congress to use the phrase granted asylum two times in the same statute to mean two separate things. Would we record any weight to the Fifth Circuit's decision in Seaway? Yes, we asked the court to join the Fifth Circuit's decision in Seaway. They didn't have the benefit of a precedential decision at that time or the Supreme Court's decision in Henson that dealt with granted in 1159B as both a past tense verb and an adjective. That would seem to be two very significant differences. I don't think they discussed the term status in the case either. They didn't. Well, a few responses, Your Honor. One, it wouldn't have mattered whether there had been a precedential or decision in that case. Two, I think that the Supreme Court's observation in Henson, it may not have been dictated in that case, but I don't know that the language that Your Honor is referring to in Henson is not really a novel concept from a grammatical standpoint. I don't think that's something that would have been news to the panel that decided Seaway. And then I forgot Your Honor's third point. I'm not sure they ever discussed the meaning of status, say as our panel did. I think it's awkward. Yes, thank you, Your Honor. It is true that Seaway did not discuss status, but I think the board over relied on that term. The board assumed that the phrase status necessarily refers to a positive or lawful status. But both the Ninth Circuit and the Fifth Circuit have held in other cases, which we cite in our brief, that the phrase status can also refer to unlawful status. And I would also point the court to what is the adjustment provision, the general adjustment provision for all non-citizens. It's HUSC 1255A. And that provision says the status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General through that of an alien lawfully admitted for permanent residence. Now, a plurality, if not majority, of non-citizens who adjust status under that provision have no lawful status. They came in on a temporary visa, overstayed that visa, and then married a U.S. citizen who then was able to sponsor them for permanent residence. But they are overstays. They have no lawful status, and yet Congress used the term status in this adjustment provision. Counsel, can I ask you a question? It goes back to what you told Judge Agee about B-2 and after being granted asylum. That's like a past tense use of granted. So if any alien granted asylum in that opening phrase is using granted as a past tense verb, it refers to having been and this would be, I'm bringing you to our Mahmoud case, that a non-citizen is still an alien granted asylum after he or she adjusts to LPR status because they were granted asylum in the past. Sure. Well, I think Mahmoud itself distinguished that on those terms. It did not involve non-citizens who were involuntarily, whose asylum status was involuntarily terminated. It involved those who voluntarily relinquished their asylum status, and it made clear that the two are not the same. Yeah. I understand that you can try to distinguish that, but I guess let me ask the question this way. So what is your definition? What definition should we adopt of any alien granted asylum as it is used in that phrase? If it can't mean, you think it doesn't mean currently granted asylum, and we know it can't ever granted asylum, granted asylum in the past, because that would sweep in someone who had now become an LPR. So what does it mean? We think it means granted asylum in the past, so long it has not been relinquished in favor of another status. And it's a funny way to say that, right? Well, I would note that the Fifth Circuit does not regard these positions as mutually exclusive. So in Seaway, as we discussed, the Fifth Circuit adopted our position on the question at issue in this case. But Seaway did not prevent the Fifth Circuit from later adopting the government's position in Mahmoud when it decided Ali versus Barr in 2020. And although she did not write either opinion, I would note that Judge Jones was on the panel that decided both Seaway and Barr. So just as the Fifth Circuit did not regard Seaway as precluding its subsequent holding in Ali, nor does Mahmoud prevent this court from adopting our position at issue in this case. I thought it didn't Seaway itself. I thought Seaway actually sort of addressed this issue because they were distinguishing a Ninth Circuit case that had, it doesn't matter. Sorry, go on. Yes, no, they did distinguish the Ninth Circuit case that Your Honor is referring to, but the point is that the panel that decided Ali subsequently did not view the positions as mutually exclusive. And I think a hypothetical may help demonstrate why those issues are distinct. So imagine the Democratic National Committee adopted an edict for all campaigns that they could only hire workers who had, quote, registered as a member of the Democratic Party. Now, a person who had once registered as a Democrat but later switched their registration to Republican clearly could not be hired under this policy. But I don't think it would be that someone who once registered as a Democrat but then had their name stricken from the voter rolls because they were convicted of a crime could not be hired under this policy. I think it would simply be a different question presenting different concerns. And so the same logic applies here. Even if a non-citizen who adjusts from asylee to LPR status no longer qualifies as an alien-granted asylum, it doesn't necessarily follow that a non-citizen whose granted asylum. So again, we think this court's decision in Mahmoud is simply distinguishable. I'll preserve the remainder of my time for rebuttal. Thank you. All right. Thank you, Mr. Winograd. Ms. Slack will now hear from you. Good morning. May it please the court. Michelle Slack on behalf of the Attorney General, Merrick Garland. Petitioner is seeking ultimately to adjust to status under a special provision that is for non-citizens who have been granted asylum. And she suffers from two defects in that regard as we move forward in this case. The first defect is the one that Petitioner's addressed, the issue of statutory construction that we find in the board's published decision in matter of TCA. And the other reason that he suffers from a defect or defects is because of his post-decision, post-pending petition, departure from the United States and return to Albania. Now, I set these arguments out in the other order in my brief. But unless the court has any questions, I'd like to address them in the order in which I just set out. First, the matter of TCA issue of statutory interpretation. Then moving to the issue of the departure and what effects that has on his eligibility for adjustment asylum. First, the issue that is in play here is the question. You have a special type of adjustment that Congress has created for asylees found in 1159B. You have someone whose grant of asylum was terminated. And now you have to ask yourself whether or not the terms, the status of any alien granted asylum, means he's still been granted asylum when that grant of asylum has been terminated. And that brings us to a question first of Chevron deference. And we would start the question with Chevron deference with step zero as administrative law experts refer to it. And that's the question of, is Chevron applicable? And we have a published board decision here, much like there was in the case of Mahmoud, in which the board addresses this specific question in matter of TCA. We also have reference within TCA to the regulations that are the sole and exclusive procedure for adjustment of status under 1159B. What would your answer be to the question that Judge Harris asked opposing counsel? Supreme Court now seems to be on a direction that says before you determine something that's ambiguous and start to look at the Chevron factors, you need to try everything you can possibly do to find the correct meaning for this that Congress intended, no matter how contradictory, confusing, and totally messed up the statute may be. So are we relieved of that duty in this case? No, Your Honor. In fact, I haven't gotten to step two yet. I would first start, Your Honor, by saying that at Chevron step zero, we clearly have the application of the Chevron process. So we would then move to step one. And I think that's the nature of your question and was the nature of Judge Harris's question as well. And I would start by looking at whether or not Congress has dealt with this precise issue. Then we would move, as the Supreme Court has cautioned, to the whole spectrum of ways. Counsel, since we're at the whole spectrum, I will just tell you, this is my concern, I guess, from your perspective. This is the biggest question I have with reading this as ambiguous. We can assume, or I will assume hypothetically, that if you look at this phrase in isolation, it doesn't speak clearly to this question. But the thing about this statute that seems sort of striking to me is how many times where Congress meant the relevant factor has to be present at the time you apply for adjustment, it said so. It said so in three, you have to continue to be a refugee. It said so in five, you have to be admissible at the time of examination for adjustment. So when it doesn't say that in the prefatory phrase or anywhere else about your asylum status, it's like the one thing it doesn't say has to be current at the time you apply for adjustment. Why isn't that extremely good evidence that Congress didn't mean it? It could have just put in the same language it has in five, at the time of examination for adjustment. It could have just put that right in, status of any alien granted asylum at the time of examination for adjustment, but it didn't put it in. Your Honor, I have a number of responses to that. I'll start with perhaps because the very definition of asylee status that we find in 1158C1 defines asylee status as the status of an alien granted asylum. So they may have felt that it would be unnecessary and redundant. So now I'm going to describe that that means it has to be current. You could say that the alien was granted asylum. It's true as a historical fact, but they don't have that status now. So does that necessarily support your argument? Your Honor, with all due respect, the statute doesn't say was granted asylum. It says any alien granted asylum. And that's part of the reason why the board said this is like the situation in Henson. And the term granted is being used as a past participle adjective to describe the word that follows it. Like the court said in Henson, like burnt toast is inedible. A fallen branch, a fallen rock blocks the path. Or if this court has a rule that admitted attorneys may be up here before the court, but I know I was disbarred last week. And I'm saying, well, I was admitted at one time. And since the rule is a historical event, I don't have to worry about the here. So the terms granted asylum and then granted asylum would have really no meaning if it wasn't a present state of something. If in the, as it's used in the provision having to do with termination. I mean, you're really looking at not just this provision in isolation as the Supreme Court suggested. You have to look at it in context as well to try to see if there's an ambiguity by looking at it in context. And if you look at it in context, the expression in you find in the termination provision at 1158 C2 speaks of an alien granted asylum cannot be removed until the asylee status has been terminated. It also uses that phrase granted asylum. And so how could you have that asylee status terminated? If in fact, you go back to C1 and that person still enjoys all the benefits of a person granted asylum because it's based on a historical event. So returning to Judge Harris's question about the, why didn't they just say it? They could have also used the phrase that is relied upon by petitioner that comes from the 1990 Act, the note to the 1990 Act, which creates a special exception for former asylees where they put in a parenthetical right after was granted asylum regardless of termination. They didn't do that either. And so along those lines, there's also a very big difference between, oh, the third reason that they probably didn't think they needed to in 1980 when they promulgated the like refugee termination. The only form of termination that existed in the immigration laws for asylum was you were no longer a refugee. So that is the similar to the provision we find in 1159 A of the consequences of termination of refugee status is like the continuity provision we find in 1159 B3 in that regard. If you could only be terminated at the time for no longer being a refugee, well, there would be no need again, somewhat redundant to add it to the preparatory language we find and that we're discussing here today. So basically, three reasons. The first is we have that expression granted asylum elsewhere and Congress understood it to mean something. And then two, that you have a companion place where the fact that they could only terminate based on no longer being a refugee, well, that's already incorporated in B3. And I forgot the third reason, I'm sorry. And as the court has suggested, so going back to whether or not we have an ambiguity, Congress has not spoken directly on this issue in the context of just looking at, in isolation, this phrase, status of any alien granted asylum. We know that because we look at, as counsel for petitioners pointed out, we look at 1159 A and we see a clear statement of the consequences of termination, right? On the other side, we look at the note that is in the 1990 Act that says, regardless of termination. The phrase that a petitioner wants to read into the statute, but isn't there. What we have on both sides are different ways that Congress could have done this to make it very clear on this precise question. Congress chose neither, and we were left in the middle. And then what it's incumbent on the court to do then is to not just walk away and say, oh, we've got an ambiguous statute. No, the Supreme Court has said, you have to go on that deeper dive. And you have to look at all the canons, the full spectrum that's available to you, the surrounding provisions. Some of the arguments already made about the surrounding provisions, you look to statutory construction tools. And that has to do with the nature of the terms chosen there, that granted asylum and the fact that it's been used elsewhere in the statute, that granted asylum, it wouldn't be used as a past tense verb in this manner. If it was used as past tense verb in this manner, you would need the helping verb that was referenced before. You'd need the was, because clearly the alien is not granting himself asylum. He's the object. So you would need some type of passive voice for this to work the way the petitioner alleges that it works. In addition to that, you have the importance of the term status here. And ordinarily, status does refer to a lawful status. It doesn't mean it always has to refer to a lawful status. But ordinarily, it's known to refer to a lawful status. And status- Can I just, just so I understand where you are, where we are in the Chevron boxes, you're under step one and you're suggesting- Yes. We have to do all of this work under one. When it's all done, is it the government's position that this is a Chevron step one case and unambiguous? We can say that unambiguously, when we look at everything, we use all of our tools, the answer is clear. Like you have to have current asylee status, or is it the government's position that even when we're finished with all of that, we're in step two and we should defer to the BIA? I think that the court could find that, as I'm pointing out, what appears to create an ambiguity or appears to suggest petitioner's reading is, and the Fifth Circus reading is correct. These are all reasons why it's either ambiguous or it's clearly the other way. Well, but I guess I'm asking you, which does the government, I mean, the government should have a position on which- No, I mean, I'm saying that the better reading is, and that's the way it's argued in the brief, is the better reading- You can tell from the brief. So your answer is this is a step one case, the right reading is that you need current asylee status. You don't need to defer that deference. And that if the court disagrees about that- I'm going to just stick you on one. So you think, this is not a deference question. We're not deferring to the BIA. We are just deciding under step one that this is the right reading of the statute. I think that's the better reading, Your Honor. But if the court disagrees and finds it, then it's at least ambiguous. I mean, I should say at worst, ambiguous. And such that the board's- On step one, we would disagree with the Fifth Circuit. Yes, Your Honor. And there are a number of reasons why you should not follow the Fifth Circuit. And the Fifth Circuit's decision is not persuasive. And if you would like, I can explain those to you, Your Honor. First of all, as you pointed out, the Syway case did not have the benefit of a board decision, a published board decision that's thoroughly examining this issue. In fact, that's a big part of the reasoning. But if the statute's not ambiguous, why would we need to even look at the BIA decision? Because they didn't have the benefit of all these arguments on the clarity of the language, the how to resolve any ambiguities if you see them. There were no arguments made in the government's briefs in Syway. They didn't have the benefit of these arguments in Syway. There were no arguments made in the government's briefs? There were no arguments made about the ambiguity or lack of ambiguity in the statute. In fact, the government's arguments rely on what the board relied on in Syway, which was that the board considered it already settled by prior precedent of the board. And a big part of the reasoning in Syway is that this prior board precedent really doesn't inform the issue at hand. It's also why they distinguish the other cases that they're discussing in Syway. I mean, the first time this issue is actually raised is in Syway. And so the court correctly recognized it was the first time it was raised. But the government made no other arguments about the statutory interpretation or any ambiguity in the Syway case. So they didn't have the benefit of that. So they can't be faulted for not having a particularly persuasive viewpoint. And I'd also point out that in Ali 2, the Fifth Circuit faced the same issue this course faced in Mahmoud, which is the flip side of the coin. In this case, we're looking at what are the courts were looking at the, what are the consequences of termination on adjustment question. And because these issues interrelate to each one another, the court is again looking at the interplay between 1158C and 1159B. And because the court in Mahmoud has already concluded like the court in Ali, that you lose the status of being an alien granted asylum when you change status or you adjust status to lawful permanent residency. Because the courts already concluded that, it's already necessarily concluded that's not a historical event. Because if the Fifth Circuit hadn't, it itself had not yet reached that question. The Ninth Circuit had, and it said, that's a different question. And it explained, I mean, I just, we don't have to follow the Fifth Circuit and you can think the Fifth Circuit was wrong. But I just don't think that this was the sort of unexamined opinion you're suggesting it was. And they very, you know, they confronted the Ninth Circuit's version of our Mahmoud decision and said, that is just a different thing. Yeah, and said it's a different thing. And the court in Ali too, that after the court in Ali one sends it back to the board to render a published decision on the precise issue. And when it comes back on Ali too, the court makes no reference to Siway. That's because it already explained they're two different questions. I feel like it sort of did that work the first time, but it doesn't matter. I don't want to you hung up in this. But a big part of the Siway decision was this difference between the language you find in 1159A and the language you find in 1159B. All right. And can I address that difference and why it's important? Because I do think it's perhaps the strongest argument makes. And it was primary basis of the Siway decision. Yes, I see. These are two different, they're not parallel provisions. You look at them and they are not, they don't describe the same process. The under 1158, 1159A, what you see is someone is admitted as a refugee. And that's a conditional admission. And then they come back before the Department of Homeland Security and their admission is converted into lawful permanent residency. The only reference to status in the A provision is a reference to, you couldn't previously have been a lawful permanent resident. If you look at the B section for asylum, it's clearly a switching of one status to another status. That is an explanation for why you wouldn't have necessarily had to put the consequence of one thing in another thing. It's looking back at the original admission in A and it's part of the continuous refugee process in B3. And those two provisions are working very differently from one another. If there are no further questions. All right. Thank you very much, counsel. Thank you. Mr. Ronagrad, you've got some rebuttal time. Thank you, your honor. The government now claims that this is a Chevron step one case. I don't know whether the Chenery Doctrine precludes the government from switching what Chevron box they're in. But I would simply note that even the board itself did not think that its position was compelled by the clear intent of Congress. And its analysis relied on tools that can't be considered at step one, such as its own precedent that postdated the statute and of which Congress could not have been aware. The government also notes the lack of an auxiliary verb in the phrase alien graded asylum. I would say Congress like people sometimes omit auxiliary verbs when they're speaking. So if I were to say today, I appeared before three judges asking questions, that would mean the same thing as I appeared before three judges who were asking questions. Sometimes it's a matter of simple fiction, we omit auxiliary verbs like that. Now, if the court goes to the second step of Chevron, I just want to emphasize exactly why we think the scheme that results from the board's decision is arbitrary and precious. As I was saying before, whether an asylee whose status has been terminated is allowed to adjust depends solely on timing, on whether the IJ considers the request for termination at the start of the hearing, or on whether they agree to defer it until the end of the hearing. The Supreme Court said in Judeling v. Holder that if an IJ were to determine a non-citizen's eligibility for relief by flipping a coin, they would reverse that policy in an instant. But that is in effect what the board has done here. Some asylees who have been convicted of an aggravated felony will be able to apply for adjustment of status, while others will not be able to apply for adjustment of status. And the only guidance that the board has provided as to why that may be is that IJs may defer ruling on a request for termination if the non-citizen is deserving of adjustment of status. But that's really no guidance at all because IJs cannot determine whether a non-citizen is deserving of adjustment of status unless they're allowed to apply and put forth evidence in support of their application for adjustment of status. And we think this scheme is particularly unreasonable because there is a far more sensible alternative. As we conceded in our brief, IJs should always consider whether to terminate asylum at the outset of the hearing because if they don't terminate asylum, there's need to have removal proceedings in the first place. The person is not subject to removal. But it doesn't follow that once a grant of asylum has been terminated, the non-citizen should no longer be allowed to apply for adjustment of status. Given that the board has allowed IJs for decades to consider adjustment applications of non-citizens whose grant of asylum could be terminated, we see no principled reason why it couldn't also allow IJs to consider adjustment applications of non-citizens whose grants of asylum have been terminated. And if the board declines to afford Chevron deference, we think it would follow that it should also decline to afford a Skidmore deference. As I noted before, the board itself did not acknowledge at all section 104 of the Immigration Act of 1990. And as we discussed in our briefs, it didn't acknowledge that USCIS takes the same position that we take in its policy manual. Counsel, can I ask you a question about the statutory note and the regardless of whether asylum has been terminated? So I read the briefs in the order I get them. I read your brief. I looked it up. I was like, wow, great argument. And then I read the government's brief and I looked at the exact same thing. And I was like, oh, yes, very good argument. I mean, this one I find really challenging. I mean, on the one hand, the government says when Congress meant, regardless of whether it's been terminated, it says so. On the other hand, how would you respond to that? I don't want to say your argument for you. What's your argument for why is that not the right way to look at that? I think it's because of the placement of the proviso in question. Had Congress started that section with that proviso, for example, by saying if it started section D by saying regardless of whether or not such asylum has been terminated under section 208B of the act, the provisions of section 209B shall also apply to an alien who, X, Y, and Z. In that case, it would very clearly serve as a notwithstanding or but-for clause. But the way they tuck it in offhandedly into a parenthetical, in my reading, makes it seem as though Congress was legislating against a background assumption that noncitizens whose grants of asylum could be terminated remained eligible for asylum, and were, in other words, aliens granted asylum. Okay. Because it's in a parenthetical, like, yeah, everybody knows it, but we just want to be clear. Yeah, it's kind of a belt-and-suspenders approach to people. Okay. Thank you, Your Honors. All right. Thank you all. We appreciate the arguments of both counsel, and we'll come down and reach you, and I'll ask the clerk if she will adjourn court until tomorrow morning. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: G. Steven Agee, Pamela A. Harris, A. Marvin Quattlebaum Jr.